UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

### Norfolk Division

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY CO. and NORFOLK SOUTHERN PROPERTIES, INC., *Plaintiffs*, v. AMERICAN TOWER CORPORATION, GLOBAL TOWER, LLC, and GTP ACQUISITION PARTNERS III, LLC, *Defendants*. | Civil Action No. 2:20-304 |

### COMPLAINT

Plaintiffs Norfolk Southern Railway Co. and Norfolk Southern Properties, Inc. file this Complaint for Declaratory and Injunctive Relief against the defendants, American Tower Corporation, Global Tower, LLC, and GTP Acquisition Partners III, LLC, and state as follows:

### INTRODUCTION

1. Plaintiffs Norfolk Southern Railway Co. and Norfolk Southern Properties, Inc. (collectively, "Norfolk Southern" or "Plaintiffs") lease to telecommunications companies both real property throughout the United States for the construction and operation of radio communications equipment and space on Norfolk Southern communication towers for the collocation of radio communications equipment. Defendants American Tower Corporation ("ATC"), Global Tower, LLC, and GTP Acquisition Partners III, LLC (collectively, "Defendants") have entered into or acquired contracts with Norfolk Southern whereby Defendants agreed, among other things, to manage and market such properties on Norfolk Southern's behalf. Defendants were

obligated under various contracts to pay rent to Norfolk Southern for some properties, and, for other properties, to collect rents from tenants and forward them to Norfolk Southern after deducting certain management fees.

2. Defendants have breached these obligations and underpaid Norfolk Southern by as much as $1 million. Defendants have admitted having underpaid Norfolk Southern, but have consistently failed to provide Norfolk Southern with a reliable accounting of the amounts they have paid under the various contracts and the amounts they still owe. Plaintiffs therefore seek a declaratory injunction that Defendants are in breach of their contractual obligations, and specific performance of Defendants' contractual obligations to make their books and records available for an independent audit at Defendants' expense for a full accounting and payment of amounts due.

## JURISDICTION AND VENUE

1. Plaintiffs Norfolk Southern Railway Company and Norfolk Southern Properties, Inc. are Virginia corporations with their principal places of business in Virginia.

2. Upon information and belief, Defendants American Tower Corporation, Global Tower, LLC, and GTP Acquisition Partners III, LLC each are Delaware corporations with their principal places of business in Massachusetts.

3. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

5. This Court has personal jurisdiction over Defendants, who conduct extensive business in Virginia, entered contracts with Plaintiffs in Virginia, and agreed that those contracts should be governed by Virginia law.

6. Venue lies in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b). Events giving rise to this action occurred in this District, and the various contracts between the parties are governed by Virginia law.

## STATEMENT OF FACTS

### Norfolk Southern Enters Into Agreements with CitySwitch, LLC

7. Norfolk Southern and CitySwitch, LLC entered into a series of contracts beginning in 2005 relating to Norfolk Southern's extensive portfolio of real estate used for telecommunications facilities such as cell phone towers.

8. The principal agreement between Norfolk Southern and CitySwitch was the Telecommunications Access and Marketing Agreement, dated April 1, 2005 (the "TAMA," **Exhibit A**). The purpose of the TAMA was "to establish protocols whereby CitySwitch may from time to time license and/or lease from Railroad certain towers and/or property from Railroad, subject to such towers and/or property being made available by Railroad and the parties reaching mutually acceptable terms regarding each applicable license or lease." CitySwitch agreed to engage in marketing to wireless communications companies with the twin goals of licensing space on existing Norfolk Southern antenna towers and leasing land from Norfolk Southern's holdings for the construction of new towers.

9. The TAMA fixed the monthly fee for each site CitySwitch licensed from Norfolk Southern. CitySwitch was free to sublicense the sites to wireless communications providers, profiting from the difference between its sublicense revenues and the license fees owed to Norfolk Southern.

10. A second agreement, the Master License Agreement, was dated April 15, 2005 (the "MLA," **Exhibit B**). The MLA set out the terms under which CitySwitch was permitted to

license space on existing Norfolk Southern towers and, in turn, make that space available to sub-tenants. The MLA established a process whereby CitySwitch would negotiate Site License Agreements with wireless communications companies, and would submit the Site License Agreements to Norfolk Southern.

11. Before the formation of its relationship with CitySwitch, Norfolk Southern had a nonexclusive marketing agreement with a different company, AAT Communications Corp. When that agreement expired in 2007, Norfolk Southern and CitySwitch entered into an additional contract, the Communications Tower Agreement—Definitive Marketing Agreement (the "DMA," **Exhibit C**), by which Norfolk Southern appointed CitySwitch its exclusive agent for the development, management, and marketing of space on Norfolk Southern's existing communications towers.

12. The DMA required CitySwitch, among other things, to: solicit licensees for available space on Norfolk Southern communication towers; develop an appropriate rental charge for available tower space; prepare license agreements; maintain a database of information on all licensees, accessible to Norfolk Southern; collect all license fees under existing and new license agreements, with a monthly accounting to Norfolk Southern of all income received; and prepare monthly financial and other reports required by Norfolk Southern. *See* DMA §§ 3.1(H), 5.1, 5.5.

13. CitySwitch expressly agreed to serve as Norfolk Southern's agent under the DMA, and to provide services "in conformance with the care and skill ordinarily exercised at the time of performance by reputable telecommunications managers qualified to provide similar services under similar circumstances using good professional judgment." DMA §§ 1, 3.3.

14. Norfolk Southern agreed to compensate CitySwitch for its services under the DMA in three ways. First, CitySwitch was entitled to assess a management fee on gross receipts CitySwitch collected from existing licensees of Norfolk Southern. DMA § 5.2. Second, CitySwitch was entitled to commission on all new licenses and license renewals. DMA § 5.3. And third, CitySwitch was entitled to an application fee for each proposal CitySwitch received from a prospective licensee for a new collocation on a particular tower. DMA § 5.4.

15. Under each of the agreements, CitySwitch agreed to keep appropriate books and records. The DMA required CitySwitch to provide "documentation support," "including, without limitation, the negotiated business terms (e.g., lengths of initial and renewal terms and all fees, rentals and other payments) for all proposed collocations at Existing System Sites." DMA § 3.1(I) (as amended Aug. 31, 2010). CitySwitch was also required to "[m]aintain currently and make readily accessible to [NS] a computer 'Site Management' database, readily available to [NS] at any time, showing pertinent information on Licensees, Existing System Sites, and on the licenses arranged for by" ATC. DMA § 3.1(J). CitySwitch was obligated under the DMA to "keep and maintain its financial records in a manner following generally accepted accounting principles and in such manner as [NS] may direct," and to "maintain and not destroy its records and accounts concerning any work it performs hereunder, including without limitation all License Agreements, other contracts and other business conducted by [CitySwitch] pursuant to this Agreement and all of [CitySwitch]'s financial and payment records. . . ." DMA § 4.15.

16. The TAMA similarly provided that, "[u]pon request made by [Norfolk Southern] from time to time, [CitySwitch] shall permit [Norfolk Southern] to review the subleases, subli-

censes and records that [CitySwitch] maintains with respect to the tenants/users of the [CitySwitch] Facilities and shall provide to [Norfolk Southern] copies with all applicable subleases and sublicenses." TAMA § 5.04.

17. The DMA, the TAMA, and the MLA (as later restated and amended, the "RAMLA," **Exhibit D**) each also entitled NS to audit CitySwitch's books and records relating to the agreements. The DMA provided that, "[a]t any time, [Norfolk Southern] shall have the right . . . to inspect, examine and audit" records, including "all . . . financial and payment records pertaining to this Agreement," and CitySwitch "shall immediately provide to [Norfolk Southern] at no charge to [Norfolk Southern] copies of such records and accounts as and when requested." DMA § 4.15.

18. The DMA further required CitySwitch to submit to Norfolk Southern each month "a report to [Norfolk Southern] which shall include a list of [Norfolk Southern]'s Licensees and amounts received by [CitySwitch] during the previous month (including any past arrearage paid during the current monthly period)." DMA § 5.5. CitySwitch was also required, upon termination of the DMA, to provide to Norfolk Southern "all books, accounting records and business records concerning the License Agreements," and to "prepare a final accounting of all sums due [Norfolk Southern] under the License Agreements and remit those sums to [Norfolk Southern] within two (2) weeks after such termination of this Agreement." DMA § 9.3.

19. The TAMA, as amended, likewise provided that Norfolk Southern "may require an audit of the [Norfolk Southern] Share associated with any Customer Agreement for individual or multiple periods." TAMA § 10.14.

20. The RAMLA specified that Norfolk Southern "may require an audit of the Gross Rent for individual or multiple periods applicable to any Sub-License Agreement." RAMLA § 6(c).

### First Global Tower, LLC and then American Tower Corporation Acquire CitySwitch's Contracts with Norfolk Southern

21. Global Tower, LLC acquired CitySwitch's assets, including CitySwitch's contracts with Norfolk Southern, by an agreement dated July 15, 2010. Accordingly, Global Tower assumed CitySwitch's obligations under the MLA, the TAMA, and the DMA. In August of that year Norfolk Southern and Global Tower agreed to amendments of each of those three agreements (amendments **Exhibits D**, **E**, and **F**, respectively). The TAMA and the MLA were further amended on October 1, 2011 (further amendments **Exhibits G** and **H**, respectively).

22. American Tower Corporation ("ATC") acquired Global Tower in September of 2013. Global Tower and its subsidiaries remained Norfolk Southern's counterparties for each of the contracts, but ATC took over the management of the agreements.

### The Master Agreements Expire or Are Terminated, While Various Site-Specific Agreements Remain

23. The TAMA and MLA, each as amended in 2011, expired on December 31, 2015.

24. After the TAMA and MLA expired, the DMA continued in force, subject to termination by either party upon 60 days' notice. DMA § 8. In a letter dated October 21, 2016, Norfolk Southern terminated the DMA effective December 31, 2016.

25. Today, while the master agreements between the parties have expired, various provisions thereof, as well as leases and licenses entered into thereunder between Norfolk Southern and ATC, Global Tower, or City Switch, remain in effect.

**Norfolk Southern Attempts, Without Success, To Reconcile Defendants' Obligations Under the Agreements to the Actual Payments Made**

26. Even before the TAMA and MLA expired at the end of 2015, Norfolk Southern began attempting to reconcile ATC's payments to Norfolk Southern with the amounts ATC owed Norfolk Southern under the various agreements. Global Tower and ATC each failed to maintain the site database required by the DMA, which was supposed to enable Norfolk Southern to oversee the management of Norfolk Southern's properties. Nor did the Defendants consistently provide Norfolk Southern with the monthly accounting and financial reports required by the DMA.

27. Norfolk Southern met with ATC personnel for the first time in December of 2013, several months after ATC acquired Global Tower. But ATC failed to provide Norfolk Southern with any kind of accounting of payments under the DMA and TAMA until September of 2014.

28. The accounting ATC provided to Norfolk Southern in September of 2014 was riddled with errors. The report omitted some sites entirely, and for others listed the incorrect rent amount. The report reflected that ATC was assessing management fees under the DMA on every site, improperly including sites where an ATC entity was the licensee, rather than Norfolk Southern's managing agent for a third-party licensee.

29. Using the September 2014 and other information subsequently provided by ATC, Norfolk Southern attempted to reconcile ATC's data with Norfolk Southern's own records. As a result, ATC repeatedly admitted error and compensated Norfolk Southern for underpayments. In March of 2020, for example, ATC remitted approximately $18,000 in back rent under two site agreements ATC had claimed had been terminated, despite equipment of ATC's subtenants remaining affixed to the Norfolk Southern towers covered by the agreements. ATC only corrected these underpayments after many months of effort from Norfolk Southern.

30. Norfolk Southern repeatedly requested a comprehensive audit from ATC, covering all site leases and licenses and all fees accrued under the DMA and TAMA.  ATC resisted these requests, instead providing Norfolk Southern with incomplete and inaccurate accounting information piecemeal.  In 2016, after many months of requests, Norfolk Southern was able to assemble ATC records for each leased or licensed site, and Norfolk Southern undertook its own time-consuming audit.  Norfolk Southern assumed for purposes of this audit that ATC had, in fact, remitted any amounts it claimed to have remitted.  This was difficult (if not impossible) for Norfolk Southern to verify, however, due to ATC's failure to provide timely reports that would have allowed Norfolk Southern's accounting personnel to credit ATC remittances to the appropriate ledger accounts.

31. Norfolk Southern's audit of ATC's payment reports showed that ATC owed Norfolk Southern $1,043,558, consisting of $828,126 in unpaid or underpaid rent, and $215,432 attributable to other issues such as the erroneous deduction of management fees for sites where ATC itself licensed space from Norfolk Southern.

32. ATC disagreed with the results of Norfolk Southern's audit, even though it was based on data provided by ATC.  Norfolk Southern and ATC agreed to a focused, site-by-site reconciliation process, whereby ATC would provide supporting documentation for its calculations of the amounts owed and paid for each site license and lease.

33. At the outset of the site-by-site reconciliation process, rather than begin working through Norfolk Southern's analysis of ATC's previously-provided data, ATC instead provided Norfolk Southern with yet new accounting data that was inconsistent with the data it had provided previously, and upon which Norfolk Southern's painstaking audit had been based.  ATC

was unable or unwilling to explain these discrepancies, causing Norfolk Southern to lose confidence that an arduous site-by-site reconciliation process would be productive.

34. For example, in November of 2016 Norfolk Southern noticed three accounting problems related to the site license agreement for a tower site in Argos, Indiana. The first problem was that ATC was deducting a 9% management fee from rents paid for the Argos site, even though ATC was the tenant at the Argos site. ATC was only entitled to collect management fees for sites where it served as Norfolk Southern's agent for a third-party tenant.

35. The second problem at the Argos site was that ATC's records showed that ATC began receiving rent payments from its subtenant at the Argos site on July 27, 2009, but that ATC only began paying rent to Norfolk Southern for the Argos site on October 1, 2009. Yet the site license agreement specified that ATC would pay rent to Norfolk Southern as soon as it began receiving rent payments from its subtenant.

36. The third problem at the Argos site was that ATC never increased its rent payments to Norfolk Southern to reflect a March 1, 2013 amendment to the Argos site license agreement. ATC's records showed that ATC's subtenant at the Argos site had increased its rent payments to reflect the amendment, but ATC did not pass those increases on to Norfolk Southern. The amount of back rent owed due to this error was more than $50,000.

37. Tim Blair of Norfolk Southern raised these issues regarding the Argos site with his counterpart at ATC in an email dated November 9, 2016. **Exhibit I**. After two months, Blair sent another email on January 10, 2017 to ask whether ATC had investigated the Argos issues. **Exhibit J**. On January 13, 2017, Sean Murphy of ATC responded to ask Blair for "any back up calculations for this issue," which Blair provided in another email later on January 13, 2017. *Id.* The calculations were based entirely on records provided to Norfolk Southern by ATC.

38. After repeated failed attempts to resolve the Argos issues along with numerous other issues at other sites, Norfolk Southern and ATC agreed in June of 2019 to investigate the issues at the Argos site individually, as a prelude to a larger reconciliation effort. On June 27, 2019, ATC provided Norfolk Southern with a spreadsheet that showed ATC's underpayments for the Argos site totaled approximate $26,000. **Exhibit K**.

39. However, the details of ATC's Argos calculations raised additional concerns. In a previous reconciliation attempt, ATC had calculated the underpayments at the Argos site to be at least $68,000. **Exhibit L** (June 30, 2017). Another previous reconciliation attempt by ATC calculated the underpayments at the Argos site to be at least $107,000. **Exhibit M** (Nov. 20, 2017).

40. ATC was unwilling or unable to explain its wildly divergent calculations. Instead, on July 9, 2019, ATC provided yet another calculation, this time showing a total underpayment at the Argos site of approximately $80,000. **Exhibit N**. Again, ATC could not explain the inconsistencies in its own calculations regarding this single site.

41. The inconsistencies and opacity of ATC's attempts to calculate the amounts it owes Norfolk Southern at the Argos site alone exemplify Norfolk Southern's broader concerns regarding ATC's accounting practices and the integrity of ATC's books and records. The same flaws that infected ATC's attempts to reconcile the amounts owed for the Argos site also infected ATC's attempts to reconcile the remaining sites, causing Norfolk Southern to lose confidence in the figures provided by ATC.

42. Another example of ATC's mismanagement and accounting failures is the tower site in Buford, Georgia. Norfolk Southern discovered underpayments and other issues relating to the Buford site in 2014, and more than five years of effort has failed to resolve these problems.

*See* **Exhibit O** (Oct. 7, 2014 email from Sean Murphy at ATC to Tim Blair at Norfolk Southern regarding recordkeeping and accounting discrepancies related to the Buford site).

43. Norfolk Southern calculated the total underpayments for the Buford site to be approximately $159,000, and asked ATC to remit that amount. *See* **Exhibit P** (March 17, 2017 email from Richard Carter of Norfolk Southern to Julie Tzortzis of ATC).

44. ATC disputed Norfolk Southern's calculation of the underpayments for the Buford site, but—as with the Argos site—ATC presented Norfolk Southern with multiple calculations of its own, each of which disagreed with the last. In June of 2017 ATC calculated that it had *overpaid* Norfolk Southern for the Buford site by approximately $9,000. *See* **Exhibit L**. In November of 2017 ATC re-calculated and determined that it owed Norfolk Southern approximately $33,000 for the Argos site. *See* **Exhibit M.** When Norfolk Southern asked for ATC to document its $33,000 calculation, ATC waited two years and then produced a third calculation, claiming to owe Norfolk Southern approximately $22,000 for the Buford site. *See* **Exhibit Q (**September 13, 2019 email from Justin White of ATC to David Shelton of Norfolk Southern attaching ATC calculation).

45. Before these issues could be resolved, Norfolk Southern discovered yet another problem regarding the Buford site: ATC had stopped paying Norfolk Southern for the Buford license agreement with MetroPCS. When Norfolk Southern raised this issue, ATC claimed that MetroPCS had terminated its license agreement—but ATC had never informed Norfolk Southern of this. *See* **Exhibit R** (Nov. 1, 2019 email from Tim Blair of Norfolk Southern to Justin TumSuden of ATC).

46. ATC's consistent failure to correctly document and account for its management of the Buford site, and the similar issues at the Argos site, are two tiles in the mosaic of ATC's

mismanagement and recalcitrance. Norfolk Southern cannot trust that ATC is accurately describing its books and records, or even that ATC *has* appropriate books and records. Only a comprehensive audit can resolve these issues.

## COUNT I

## BREACH OF CONTRACT

47. The foregoing allegations are realleged and incorporated by reference as if set forth fully herein.

48. The TAMA, the DMA, and the various leases and Site License Agreements between the parties created legally enforceable obligations toward Norfolk Southern on the part of Defendants. Those obligations included the payment of certain sums and the maintenance of appropriate books and records, available for audit at Norfolk Southern's request.

49. Defendants breached their obligations to Norfolk Southern by failing to pay Norfolk Southern the amounts required under the agreements, by failing to maintain appropriate books and records, and by failing to comply with Norfolk Southern's reasonable requests to audit Defendants' books and records under the agreements.

50. Norfolk Southern has been injured as result of Defendants' breach, potentially suffering damages of more than $1 million, with the specific amount to be determined based on an audit of Defendants' books and records.

## **PRAYER FOR RELIEF**

Wherefore, Norfolk Southern prays for the entry of an order (a) declaring that Defendants are in breach of their contractual obligations to Norfolk Southern; (b) requiring Defendants to submit to an audit of their books and records relative to their agreements with Norfolk Southern; and (c) awarding such other relief as the court deems just and proper.

Respectfully Submitted,

/s/ Gordon D. Todd
Gordon D. Todd, VA Bar No. 45934
Lucas W.E. Croslow
Sidley Austin LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (facsimile)
gtodd@sidley.com
lcroslow@sidley.com

*Counsel for Plaintiffs*